UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 2:08-CR-102 |
| V. | ) | District Judge Greer |
| | ) | Magistrate Judge Inman |
| JESUS HUERTA *ET AL.* | ) | |

**REPORT AND RECOMMENDATION**
**REGARDING BARNETT'S MOTION TO SUPPRESS EVIDENCE, (DOC. 432)**

On May 13, 2008, two Texas state troopers conducted a traffic stop of a recreational vehicle driven by the defendant on Interstate 20 in Texas. Ultimately, one of those officers searched the RV, discovering a sizable quantity of packaged marijuana. Defendant Wiley E. Barnett has filed a motion to suppress any evidence of that marijuana, claiming that the traffic stop was unlawful. (Doc. 432).

This motion has been referred to the magistrate judge pursuant to the standing order of this Court and 28 U.S.C. § 636. An evidentiary hearing was held on November 9, 2009. The two Texas state troopers, Brandon Smith and Jacob Muehlstein, were the only witnesses.

At the outset, the magistrate judge found that both of these troopers were extremely creditable and forthright witnesses, and they were believed. The court watched the video tape of the traffic stop (Exhibit 2), and none of the events depicted by that recording in any way contradicts the testimony of the two officers.

On May 13, 2008, Trooper Smith, accompanied by his then-partner, Trooper Muehlstein, were on routine traffic patrol near Kilgore, Texas. They were parked on the shoulder of the eastbound lanes of I-20. Smith was driving the patrol car, and Muehlstein was sitting in the passenger seat.

The troopers first noticed the RV driven by the defendant when it passed them. At that time, it was in the inside or "fast" lane of the interstate. As it moved beyond them, the RV moved into the outside or slow lane. However, it did not stop its rightward movement in the outside lane, but drifted across the white line, the so-called "fog line," that marked the right-most edge of that lane. The RV then moved back to the left into the right lane of travel, but then again drifted across the fog line, and once more back into its proper lane of travel. Seeing all this, Trooper Smith pulled out into traffic to catch up with the RV. When he got behind the RV, he activated his blue lights, which in turn activated the patrol car's video camera. Both the video and audio recordings of the traffic stop are of excellent quality.

Trooper Smith approached the RV from the passenger side and awaited Mr. Barnett's exit from the vehicle. The trooper told Mr. Barnett why he had been stopped, and Barnett essentially agreed with the trooper, saying that he was distracted because he was watching another car.

Trooper Smith, as one would expect, asked Mr. Barnett for his drivers license and the registration papers for the RV. Barnett was able to produce a drivers license, but he had no "papers" regarding the RV. That prompted the trooper to ask him if he owned the RV, to which Barnett replied, "Yes and no." It is noted that this conversation occurred well within

2

fifteen seconds of their initial meeting at the passenger door of the RV. Trooper Smith understandably asked to see evidence, or at least get an explanation, regarding Mr. Barnett's possession of the RV, prompting Mr. Barnett thereafter to search for the paperwork regarding his purported purchase of this RV.[1] As Mr. Barnett searched for the paperwork regarding his purchase of the RV, Trooper Smith casually, and in a friendly manner, questioned him regarding where he was going, where his trip commenced, and the purpose of his trip. Barnett said that he had just moved to Houston, and that he was on his way back to Tennessee to get his personal property, saying at one time that he intended to get his furniture, and another time that he was going to get his car. It struck Trooper Smith as rather odd that Mr. Barnett would purchase a recreational vehicle to haul his furniture back to Houston, Texas. Also, the trooper noted that Interstate 20 was hardly the best route to East Tennessee from Houston, Texas. Indeed, it was a rather indirect route to East Tennessee, which is easily seen when looking at an interstate map of the United States. Later in the conversation, defendant said that he wanted to go through Little Rock, Arkansas because "he had people there." Again, Interstate 20 is *far* from being the best route to Little Rock; indeed, every mile he drove on Interstate 20 was a mile further away from Little Rock. To be sure, Mr. Barnett had an explanation for his presence on Interstate 20, including defective directions from a GPS, but the fact remains that Mr. Barnett had offered two non-plausible

---

[1]It is assumed that Mr. Barnett was in the RV searching for these papers, although he is out of camera range at the time. However, his words can be heard clearly.

3

reasons for his presence on Interstate 20. And, lest the point be missed, defendant was continually looking for his paperwork regarding his purchase of the RV as he imparted this information to Trooper Smith; relatively little time passed - about 3 minutes - until Smith asked Barnett to step out of the vehicle and (impliedly) stop his search for papers regarding the RV.

Trooper Smith also asked Mr. Barnett if he had a criminal record, and Barnett responded that he had had only a traffic ticket. Trooper Smith took defendant's drivers license to his vehicle and, as per ususal practice, asked the dispatcher to do a computer search to determine if Mr. Barnett's drivers license was valid and if he had any arrest warrants outstanding. Unfortunately for Mr. Barnett, Trooper Smith also asked his dispatcher to run a criminal records check on Mr. Barnett. In a very short period of time, and approximately 6-l/2 minutes after Smith's initial contact with Barnett, the dispatcher radioed back to Smith, telling him that (1) the drivers license was valid, and (2) Mr. Barnett had several criminal convictions including various drug convictions and assault.

Mr. Barnett was not required to answer any of Trooper Smith's questions regarding his criminal history, but he did so, and the false answers he gave were reasonably calculated to raise legitimate suspicions, especially when coupled with his other implausible responses to Trooper Smith's questions. Trooper Smith's aroused suspicions prompted him to ask Mr. Barnett's consent to search the vehicle, and Barnett consented seven minutes after initial contact.

Smith's search of the vehicle took about twenty seconds. Stacked all about the RV, more or less in plain view, were bundles of marijuana, weighing almost 600 pounds. The discovery of the marijuana led immediately to defendant's arrest and the administration of *Miranda* warnings.

From the commencement of the traffic stop to defendant's consent to search the vehicle, and then to the culmination of that search, required slightly more than eight minutes, a great deal of which was consumed by defendant himself in his effort to find that which he should have had readily available, *viz.*, the paperwork regarding his purchase of the RV. Although defendant did not raise the issue, there was no inordinate delay between the traffic stop and his consent to search the vehicle. The only issue explicitly raised by defendant was the probable cause for the traffic stop itself, arguing that Mr. Barnett's drifting across the white fog line was insufficient to give rise to probable cause to believe that a traffic violation had occurred, citing *United States v. Freeman*, 209 F.3d 464 (6th Cir. 1998): "We can not, however, agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane [as the law requires]." *Id.*, at 466.

Mr. Barnett, however, did not weave into the emergency lane for just a few feet or in an instant of time. He crossed across the fog lane once, then moved back into his proper lane of travel, then once again crossed the fog line. The successive movements across the fog lines distinguishes this case from the situation in Freeman, and is more analogous to *United*

5

Case 2:08-cr-00102-JRG-MCLC Document 672 Filed 11/10/09 Page 5 of 7
PageID #: 2506

*States v. Randall*, 62 F.App'x. 96 (6th Cir. 2003).

In his cross examination of the troopers, defendant's attorney did his best to explain Mr. Barnett's movements. He suggested that Mr. Barnett perhaps had initially moved over into the inside or left lane as he approached the trooper car for the sake of the troopers' safety, and then began his movement back into the right lane after he had passed the car. Perhaps that is so, perhaps not, but it is irrelevant in either event.

Defense counsel also suggested that a strong wind might have been blowing from defendant's right on that occasion, and that defendant was steering somewhat to the right in an effort to offset the force of the wind. For one thing, the United States introduced meteorological data for that day that reflects that there were no wind gusts and that the wind was blowing no more than fourteen miles an hour at the time of the traffic stop. But again, the presence or absence of wind gusts is irrelevant as far as probable cause to make the traffic stop was concerned. The *cause* for defendant's driving movements, whether wind or something else, perhaps would be relevant to Mr. Barnett's guilt or innocence regarding any traffic ticket he may have been given, but it has nothing to do with the officers' probable cause to make the initial stop. Moreover, it must be recalled that Mr. Barnett himself said that he drifted across the fog line as he did because he was looking at another car.

In conclusion, this court is persuaded by the testimony of these Texas troopers that they legitimately pulled over the RV driven by Mr. Barnett for the offense of driving across the "fog line." There was no violation of the Fourth Amendment, and it is respectfully

recommended that defendant Barnett's motion to suppress (Doc. 432) be denied.[2]

Respectfully submitted,

s/ Dennis H. Inman
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).